# EASTERN BUILDING AND LOAN ASSOCIATION OF SYRACUSE, NEW YORK,

*v.*

## OLMSTED.

CONTRACTS; BUILDING ASSOCIATIONS; ULTRA VIRES.

1. Whether a contract between a building association incorporated in New York and a borrowing member, consisting of promissory notes payable in New York; a deed of trust executed in this District upon real estate here, to secure payment of the notes, and the constitution and by-laws of the association which are referred to in the deed of trust and made part thereof, is to be construed according to the laws of New

York as expressly provided for by such by-laws, or according to the laws of this District, *quære.*

2. Where the by-laws of a building association are uncertain in their meaning and bearing upon contracts entered into with persons applying for membership, or there is uncertainty or ambiguity in the terms of a special contract for a loan, a construction most favorable to the subscriber will be adopted.

3. A general covenant contained in a deed of trust given by a borrowing member to a building association to secure a loan, " to keep and perform all promises and engagements made and entered into with the said association according to the true intent and meaning of its by-laws and articles of association," can not be interpreted as changing the obvious intent and purpose of that instrument.

4. Where a building association advanced $3,500 to one of its members and received therefor an assignment of the shares of stock held by him, and a deed of trust upon his real estate to secure his 78 promissory notes aggregating $4,245.57, payable to the association in from one to 78 months, and the deed of trust provided that upon full payment of all of the notes and interest, and all proper fines, costs, charges, etc., the deed of trust was to be released, it was *held,* in a suit by a person who purchased the property after 75 of the notes had been paid, that he was entitled to a release of the deed of trust upon payment of the three remaining notes, and that a claim by the association that the deed of trust also secured the payment of possibly accruing dues after the payment of the last note and would remain in force indefinitely, or that in case of sale the surplus proceeds would have to be retained for the same purpose, was opposed to the plain meaning of the terms of the deed of trust, which could not be given this additional scope by the reference contained in it to the constitution and by-laws of the association.

5. Such a suit can not be successfully defended upon the ground that the contract of loan being for a definite period was *ultra vires* of the association and void, as the deed of trust is part of the contract, and if that is void must fall with it.

No. 967. Submitted April 6, 1900. Decided April 25, 1900.

HEARING on an appeal by the defendant from a decree of the Supreme Court of the District of Columbia granting the relief sought in a suit for the cancelation of certain notes and the release of a deed of trust. *Affirmed.*

The COURT in its opinion stated the case as follows:

This is a suit in equity commenced by Edwin B. Olmsted,

on May 1, 1899, to obtain the cancelation of certain notes and the release of a trust deed securing the same upon certain land in the District of Columbia.

The defendants are the trustees named in said instrument and the beneficiary thereof, The Eastern Building and Loan Association of Syracuse, N. Y. The cause was submitted upon bill and answer in the court below, and resulted in a decree sustaining the prayer of the bill, from which the building and loan association alone has appealed.

The appellant was regularly incorporated under the general laws of the State of New York and was organized about December 16, 1890, for the purpose of accumulating funds for the purchase of real estate, erection of improvements, paying off incumbrances, or to aid its members in acquiring real estate, making improvements, paying off incumbrances, and for accumulating funds to be returned to members who did not obtain advances, etc. Act of April 10, 1851, Ch. 122.

The scheme of subscription, issue, payment and redemption of shares is, by section 2 of this act, broadly conferred upon the incorporators; and the only positive declaration of the law, in that respect, is found in section 4, as follows:

"4. It shall be lawful for the trustees to call in and demand from the stockholders respectively, all such sums of money by them subscribed, at such times, and in such payments or instalments, as the articles of association shall prescribe, under the penalty of forfeiting the shares of stock subscribed for, and all previous payments made thereon, if payment shall not be made by the stockholder within sixty days after a personal demand or notice requiring such payment shall have been published for six successive weeks in the newspaper nearest to the place where the business of the company shall be carried on as aforesaid."

Section 11 makes all shareholders individually liable for the debts of the association to an extent equal to the amount of stock held by them respectively. This act was amended June 9, 1875. Section 7 was amended so as to

permit the trustees, under certain limitations and subject to certain penalties, to declare dividends from earnings, and with a further provision as follows:

. "No holder of redeemed shares shall claim to be exempt from making the monthly or other stated payments provided in the articles of association, upon the ground that, by reason of losses or otherwise, the association has continued longer than was originally anticipated, whereby the payments made on such shares may amount to more than the amount originally advanced, with legal interest thereon; nor shall the imposition of fines for the non-payment of dues or fees, or other violation of the articles of association, nor shall the making of any monthly payment required by the articles of association or of any premium for loans made to members be deemed a violation of the provisions of any statute against usury."

The articles of association, duly subscribed and certified, express the following as the objects of the incorporation:

"II. This association is formed for the purpose of purchasing real estate; for the erection of buildings or other improvement, and the improvement of lands; for aiding members in acquiring or improving real estate, or of removing incumbrances thereon by means of advances; for accumulating a fund for the benefit of members who do not obtain advances; and for the purpose of conducting the general business of a building and loan association and providing the advantages usually expected from savings banks and other institutions of like character."

Other provisions of the charter claimed to bear on the matters in controversy are as follows:

"IX. The entrance fee of new members and new shares shall be one dollar ($1.00) per share of stock in said association. The monthly dues per share shall be seventy-five cents (.75).

"There shall be a transfer fee of two dollars ($2.00) on each and every certificate of shares transferred.

"The fines for non-payment of dues shall be ten cents (.10) on each and every share of stock unpledged, and twenty cents (.20) on all stock pledged for each and every month the payment may be in arrears.

"In case a monthly payment on any share shall become past due and payable for a period of six months or more, such share shall be sold for the purpose of paying the arrearages. The proceeds of the sale shall first be used to pay all back monthly payments and fines and the balance remaining after paying all accrued fines and monthly payments shall be paid to the member in whose name the stock stands at the time of sale. If the stock brings no more than enough to pay the accrued fines and monthly payments, it shall be bid in by the association and canceled and the amount standing to the credit thereof in the loan fund shall be divided among the other shares as profits.

"X. The advances or loans made to any member of this association shall not exceed the face value of the stock owned by him, and except as hereinafter stated shall be upon satisfactory first mortgage, real estate security and be under such rules and regulations as the by-laws and the board of directors may require.

"Loans may be made upon shares in good standing and in force one year to an amount not exceeding 90 per cent. of the monthly dues paid to the association upon such shares as collateral security, and upon such note, bond or other obligation or instrument as the board of directors and by-laws may require.

"A uniform premium of 10 per cent. shall be paid and allowed by the borrower upon each loan; and upon all loans the borrower shall pay interest at the rate of 5 per cent. per annum and a premium of 5 per cent. per annum as a redemption fee and the same shall be paid on the last Saturday of each month during the continuance of said loan at the principal office of the association. In case the monthly instalments on loans are not paid as aforesaid,

then interest at the rate of 6 per cent. per annum, payable semi-annually shall be collectible thereon; and in case default shall be made in the payment of the regular monthly instalments, fees or dues, the association may compel payment of principal, interest and premium, assessments, fees or dues, by proceeding upon the note or other obligation and mortgage, which shall at once become fully due and payable, and the association may cancel and treat as forfeited the shareholder's shares of stock, whether deposited as collateral security or not, and all payments previously made thereon shall be forfeited to the association.

" XII. Shares which are not pledged may be withdrawn before maturity provided the same are in good standing and all dues and fines have been paid to date. The association shall have the right to require at least thirty days' prior notice of intention to withdraw. Upon such withdrawal the holder will be entitled to receive thereon the amount of the monthly instalments that have been paid with such additional interest, if any. as the by-laws may provide, except that the same shall not exceed the net earnings of said stock. But in no event, shall the association be required to pay to withdrawing members more than one-half of the net receipts of the monthly instalments paid in during the month in which the withdrawals occur. In no case shall a withdrawal from the loan fund exceed the amount of the instalments paid thereto, together with the estimated amount of the earnings upon the same.

"XIII. The association shall have the right to mature any shares of one year's standing and to issue in the place thereof paid-up certificates of shares payable at maturity with interest at the rate of 6 per cent. per annum or at maturity of stock in pledge payable at maturity of loan.

"It shall also have the right to cancel any unpledged certificate of shares after it has been in force three years upon the payment to the holder of the total amount of instalments paid thereon, together with interest thereon at

the rate of 8 per cent. per annum to date of cancelation.

"XV. The amount to be paid to the owners of shares at maturity shall be one hundred dollars ($100) per share.

"XVII. The amount of capital stock of this association shall be fifty millions of dollars ($50,000,000) divided into shares of one hundred dollars ($100) each, as provided by the by-laws.

"The funds of this association shall be divided into two classes, which shall be called respectively, the loan fund and the expense fund. The expense fund shall consist of all admission, transfer, insurance, abstract and attorneys' fees, amounts paid for insurance or taxes on property on which loans have been made, fees, costs and disbursements of foreclosure, together with ten cents per share per month from the monthly payment on stock, and these funds so constituted shall be devoted to the payment of operating expenses and said insurance and taxes. The loan fund shall consist of all receipts which do not go into the expense fund as hereinbefore provided together with all interest and accumulations from whatever source.

"No money can be drawn from the loan fund for any other purpose than the making of loans on security as provided by the by-laws and to pay amounts due withdrawing shareholders."

By regulation of the by-laws, each person wishing to become a member was required to subscribe an application in which he agrees to obey all terms, conditions, etc., referred to in the certificate of shares, and to comply with all rules and regulations of the association; and further constitutes the secretary his proxy to represent him at all the meetings, etc.

Such an application was signed by John A. Carr, under whom the complainant holds title to the land involved. As original subscriber and as assignee of another, said Carr obtained a certificate for 35 shares.

The certificate therefor contains the following recitals,

among others that are not recited because they are either contained in the charter as above quoted, or have no possible bearing upon the questions raised, ". . . and in consideration of the membership fee together with agreements and statements contained in the application for membership in the association, and full compliance with the terms, conditions and by-laws printed on the front and back of this certificate, which are hereby referred to and made a part of this contract, and the said Eastern Building and Loan Association of Syracuse, New York, agree to pay said shareholder, or his heirs, executors, administrators, or assigns, the sum of one hundred dollars for each of said shares at the end of seventy-eight months from the date hereof, or in case of his death prior to the expiration of seventy-eight months, the association will pay the sum of all monthly instalments paid on this certificate with interest at 6 per cent. per annum, payable in the manner and upon the conditions set forth in said terms, conditions and by-laws hereto attached. All payments under this certificate are payable at home office of the association at Syracuse, New York, within sixty days after the acceptance and approval of satisfactory proofs.

"This certificate of shares is issued to and accepted by the holder thereof upon the following express terms and conditions:

"Fourth. Any member in good standing may withdraw their monthly instalments at any time by first giving thirty days' notice, and will receive 6 per cent. annual interest on all shares of six months' standing and up to two years; the third year 7 per cent.; and any time after the third year and before maturity 8 per cent.

"Ninth. The by-laws of this association, which are attached to and indorsed hereon, are a part of this contract, and such by-laws and this certificate are to be construed together as part of the contract between the association and the shareholder.

"Twelfth. No shareholder shall have any claim to any interest in the affairs, assets or funds of this association, nor the control of them, except as above specifically set forth, and assumes no further liability of any kind whatsoever, except as hereinafter·described.

" Thirteenth. In every case where this contract shall cease and determine, or become null and void, then all payments made thereon shall become forfeited to the association."

The following are some of the conditions indorsed on the back of the certificate that are not contained in the body of the same or the charter and by-laws above set out:

"Sec. 3. All loans made by this association shall be upon satisfactory bond or note and first mortgage, trust deed or other proper instrument, giving first real estate security, together with fire insurance policy in some approved company, if upon improved property; and for every one hundred dollars ($100) of loan made to the shareholder, there shall in addition thereto be transferred in· pledge to the association one share of the stock held by said shareholder as collateral security on all loans made by the association to the shareholders.

"Sec. 5. Borrowing members who shall neglect to pay any instalments on stock and interest on their loans, as the same become due, shall pay to the association a fine of 25 cents per month on each one hundred dollars that they may have borrowed from the association. Non-borrowing members who shall neglect to pay their monthly instalments promptly shall pay to the association a fine of 10 cents per month on each share of stock owned by them.

"Sec. 6. Should a shareholder whose property is mortgaged to the association desire to release the same by repayment of his indebtedness he may on application to the association be allowed to do so by giving thirty days' notice in writing of such intention, and be allowed an equitable discount therefor, to be fixed by the board of directors.

"Sec. 8. Any shareholder may sell or transfer property mortgaged to the association, and the purchasers must assume all stipulations, agreements and conditions of the original mortgagor by a proper instrument in writing, to be paid for at his own expense. Said person purchasing must also purchase the shares held by said shareholder, which will be transferred on the books of the association to said purchaser, all assessments or instalments thereon being paid up to the time of transfer upon payment of fees therefor; or the association may accept a new mortgage from said purchaser to secure the former loan, until the expiration of said loan, upon the same or other sufficient property, upon payment of all fees and expenses thereof.

"Sec. 10. If any shareholder or any person shall neglect to pay the interest or instalments on his loan, or the regular monthly instalments, fees or dues for six (6) months, the secretary may compel payment of principal, interest and premiums, assessments, fees or dues, by proceeding on his note and mortgage, which shall at once become fully due and payable, and the association may cancel and treat as forfeited the said shareholder's shares of stock, whether deposited as collateral security or not, and all payments previously made thereon shall be forfeited to the association. Punctuality and strict performance on the part of all members, borowers and shareholders, in payment of fines, dues, interest, loans and premiums, are made the essence of the contract.

"Sec. 11. Any shareholder may pay his instalments, interest and premium in advance, or deposit with the association a certain sum to be used for such payments as they may fall due, and the association will receipt for the same and notify when said deposit is exhausted. If members make payments in advance for a period of six months or over, a discount may be allowed at the rate of 5 per cent. per annum for the time each payment is actually advanced.

"Sec. 12. Any shareholder who has made a loan by

giving taxable property as a security shall be bound to pay all State or city, or other taxes or assessments, as they become due, in addition to all other payments, and his failure to do so will make his loan, notes, mortgages, premiums and interest at once fully due, and payable at the option of the board of directors.

"Sec. 13. Each share of stock shall be charged with any and all amounts that may be owing from the shareholder or of his assigns, to the association, whether in dues, loans, fines, interest or premiums, and all certificates of stock in said association shall, whether mentioned therein or not, be subject to a lien thereon, to secure any such indebtedness, and the right to deduct and withhold the amount of any such indebtedness is hereby expressly reserved to the association.

"Sec. 18. If shares are withdrawn at any time before maturity, the holders thereof will be entitled to receive the amount of the monthly instalments paid; after six payments have been made on stock, the holder thereof can withdraw the monthly instalments that have been paid with interest at the rate of 6 per cent. per annum, 7 per cent. per annum after two years, and 8 per cent. per annum after three years.

"Sec. 21. And it is hereby expressly agreed between all shareholders and this association, that a payment of $100 per share, named in their certificate, that has been in force till maturity, shall be accepted as full payment of all claims on their certificate or against this association."

It is further stipulated that loans shall not be made until after three months' dues, etc., shall have been fully paid. Loans upon stock alone can only be had after one year's payment, and then only to the extent of 90 per cent. of paid dues.

John A. Carr made application for a loan of $3,500, therein agreeing to abide by all the rules, regulations, etc., as required. This having been accepted, he returned said

certificate for thirty-five shares of stock to the association, first having separately subscribed the two following indorsements thereon in the presence of an attesting witness:

"The within mentioned shares of stock in the Eastern Building and Loan Association of Syracuse, N. Y., are hereby withdrawn and I have this day received the sum of —— dollars, in full of the amount due me by reason of such withdrawal.

"Dated at——, 18—.

"For value received and in consideration of an advance upon loan made or about to be made by the Eastern Building and Loan Association of Syracuse, N. Y., upon thirty-five shares of the capital stock represented by certificates Nos. 14849, 14865 (hereto attached), and in order to more fully secure the payment of the moneys accruing from time to time on said loan, I, the subscriber, do hereby sell, assign, transfer, and set over unto said association all right, title, and interest in and to said shares, including all payments now or hereafter made thereon and all earnings, profits, or benefits arising therefrom or attached thereto. It is expressly understood that the membership of the subscriber shall continue in full force and effect in said association under said shares except as herein provided. When said loan shall be fully paid or the security other than that of this instrument given for the payment thereof shall be foreclosed, then said shares shall be canceled and become void.

"Witness my hand and seal this 1st day of December, A. D. 1892."

On the same day, the said Carr and wife executed a deed conveying the land in controversy to trustees to secure the said loan.

The instrument is regular in form and contains, among others, the following recitals that have been relied upon as material:

"Whereas the said John A. Carr is justly indebted unto the Eastern Building and Loan Association of Syracuse,

N. Y., a body corporate in the sum of four thousand two hundred forty-five & $\frac{57}{100}$ (4,245.57) dollars the same being the principal, interest, premium and dues on a loan from said association which said loan was made pursuant to and is accepted under the provisions of the articles of incorporation and by-laws of said association which are hereby referred to and made part of this contract which said loan is evidenced and secured to be paid by seventy-eight certain promissory notes of even date herewith executed by said John A. Carr each for the sum of $55.44 except the three maturing last which are each for the sum of $29.19 all payable to the said association at its office in Syracuse, N. Y., as follows, one of each of said notes is to be paid on or before the last Saturday of each and every month until all of said notes are fully paid together with interest on each of said notes after maturity at the rate of six per cent. per annum payable semi-annually until said notes are fully paid ; and being desirous to secure the punctual payment of said indebtedness according to the tenor and effect of said promissory notes together with all interest, costs and fines due and accruing thereon   .   .   .   in trust to permit the said John A. Carr, and his heirs, or assigns to use and occupy the said premises and the rents, issues and profits thereon to have and apply to and for his or their sole use and benefit until default be made in the payment of any of said promissory notes, or any part thereof, or any proper costs charge commission half commission or expense in and to the same, or until a breach of any of the covenants or agreements herein contained.   And provided that upon the full payment of all said promissory notes, and the interest thereon and all of the proper fines, costs, charges, commissions, half commissions and expenses, and upon the performance of all covenants and agreements herein at any time before the sale hereinafter provided for to release and reconvey the said described premises unto the said John A. Carr or his heirs and assigns at his proper cost and expense.

. . . And the said John A. Carr for himself and his heirs, executors, administrators and assigns hereby covenants and agrees to pay the aforesaid indebtedness according to the tenor and effect of said promissory notes as hereinabove specified, and the interest accruing on said notes after maturity and all fines and penalties that may be imposed pursuant to the articles of incorporation and by-laws of the said association, and also to keep and perform all promises and engagements made and entered into with the said association according to the true intent and meaning of its by-laws and articles of association ; also at his own expense," etc., etc.

On July 11, 1893, said Carr conveyed the said land described in said trust deed and subject thereto to Norman E. Ives, who in turn conveyed to the complainant, Edwin B. Olmsted, on March 1, 1899, in the same manner.

On the date last named the said Carr was not in arrears to the association on any account. All of the notes recited in said trust deed had been paid save the three last for $29.19 each. These were not due, but were payable at the option of the maker before maturity.

On March 13, 1899, Olmsted remitted to the association the money necessary to pay off said notes and demanded a release of the trust deed; which demand was refused.

The answer, after setting out the charter, by-laws, etc., heretofore mentioned, alleged the following grounds of refusal of the complainant's claim:

"That the monthly payments mentioned and referred to in said deed of trust comprise the monthly payments of dues estimated to accrue and become payable on said thirty-five shares until the same should mature or reach their par value, said dues being at the rate of seventy-five cents per share per month, and in addition thereto the aforesaid monthly interest and premium during said period.

"That under and by virtue of the by-laws of this defendant (a copy of which in force at the time said certificates

of shares were issued, as aforesaid, and said advance or loan made is printed on the back of said certificates), and which were expressly made a part of said deed of trust and the provisions of this defendant's charter or articles of incorporation, both of which the said John A. Carr for himself, his heirs, executors, administrators, and assigns, under and by virtue of said deed of trust, covenanted and agreed to keep and perform according to the true intent and meaning thereof, as well as said law under which defendant was incorporated, said John A. Carr and his assigns, including the complainant herein, agreed and became obligated to pay the dues on said shares until the same matured and the interest and premium aforesaid on said advance until said maturity.

"(*d.*) This defendant, further answering, avers, alleges, and charges that only the monthly payments of dues on said certificates of shares from and including the date thereof respectively, to wit, September 1, 1892, to and including the month of February, 1899, have been paid, and only said monthly interest and premium on said loan or advance, amounting to $29.19 per month, has been paid from and including the month of December, 1892, to and including the month of February, 1899; that no dues accruing on said shares or interest or premium on said loan accruing since the month of February, 1899, has been paid; that neither at the time of the commencement of this action nor at any time prior thereto had said shares of stock so advanced upon, as aforesaid, or either of them attained the value of $100.00 each, and that all of said shares of stock had not then and have not now attained the value of more than the sum of $2,101.09; that on the 13th day of March, 1899, and at the time of the commencement of this action there was justly due and owing to this defendant on account of said advance and secured by said deed of trust, after applying the value of said shares thereon, upwards of the sum of $1,500.00, and that there is now justly due and owing to

16 Ct. App.—27

this defendant, after applying the said shares so advanced or loaned upon, the sum of $1,569.86, with interest, premium, and fines accruing from August 1, 1899, no part of which said sum has been paid to this defendant, and that this defendant is entitled to the payment of at least said last mentioned sum before it should be required to release and discharge its said deed of trust."

It is also alleged that, before the complainant purchased said land subject to the trust deed aforesaid, he was fully informed of the claims of the association as stated in the answer.

Upon the facts so disclosed, the court below was of the opinion that the complainant was entitled to the release prayed for, upon the payment of the said notes as tendered by him, and so decreed.

*Mr. John Ridout* for the appellant:

1. Appellant's articles of incorporation, the laws of New York (Ch. 22, 1851; Ch. 564, 1875); the application for stock and certificate of stock, with the terms and conditions printed on its face, and the by-laws printed on its back, read and construed together, form the contract between appellant and Carr and Richards. *Marsh* v. *Dodge*, 66 N. Y. 533; *Seward* v. *Huntington*, 94 N. Y. 104; *Gibbs* v. *Bank*, 83 Hun, 92; *O'Malley* v. *People's Asso.*, 92 Hun, 572; *Englehardt* v. *Loan Asso.*, 148 N. Y. 281; *Heslin* v. *Eastern*, 28 N. Y. Misc. 376.

2. The articles of incorporation, read with the creative statute, constitute the charter of the appellant, its fundamental and organic law. They fix the rights of stockholders, and are in the nature of a contract between the incorporators, and, in practical effect, between the appellant and its stockholders, which neither party is at liberty to violate. Thompson on Build. Asso., 15 and 16, and cases cited; 1 Morawetz on Corp., 96; 1 Beach on Corp., 521; 1 Thompson on Corp., Sec. 1136.

3. The seventy-eight months period named in the certificates of stock held by Carr, is not a guaranteed, but simply an estimated period of maturity. *O'Malley* v. *People*, 92 Hun, 572; *Daley* v. *People*, 52 N. E. Rep. 1090; Sec. 1, Ch. 564, Laws of N. Y. 1875; *Lockhart* v. *Van Alstyne*, 31 Mich. 76; Cook on Corp., Secs. 271, 540, 546, 547; Thompson on B. and L. Asso., 60; Endlich on B. and L. Asso., Secs. 323, 324.

4. The court must strive to give effect to all the provisions of the contract, and enforce the actual meaning of the parties to it as evidenced by all the language used within the four corners of the instrument. *Eddy* v. *Corporation*, 143 N. Y. 311; *Coleman* v. *Beach*, 97 N. Y. 545. The application for stock, the certificates of stock, together with the terms and conditions and the by-laws printed thereon, the articles of incorporation of the appellant, the laws of New York, the applications for advance and loan, and the notes and the deed of trust, must all be read and construed together to ascertain the actual contract.

5. The contract between the appellant and Carr and his subsequent grantees, including the notes executed by Carr, must be construed and controlled according to the laws of New York, for the reason that the contract, including the notes, was by its express terms, payable in the State of New York. *National Asso.* v. *Ashworth*, 22 S. E. Rep. 521; *Nichols* v. *People's Asso.*, 93 Va. 380; *Bearden* v. *People*, 49 S. W. 64; *Kilgore* v. *Dempsey*, 25 Ohio St. 507; Wharton, Conflict Laws, Sec. 507; *Bennett* v. *Eastern Asso.*, 177 Penna. St. 233; *B. & L. Asso.* v. *Logan*, 66 Fed. Rep. 827; *Equitable Asso.* v. *Vance*, 27 S. E. Rep. 274; *Tobin* v. *McNab*, 30 S. E. Rep. 827; *People's Asso.* v. *Tinsley*, 31 S. E. 508; *Ware* v. *Banker's Co.*, 29 S. E. 744; *Steam Co.* v. *Insurance Co.*, 129 U. S. 397; *Security Co.* v. *McLaughlin*, 87 Ga. 1; *Dugan* v. *Lewis*, 79 Texas, 246; *Lanier* v. *Trust Co.* (Ark.), 40 S. W. 466; *Caesar* v. *Cappell*, 83 Fed. Rep. 403; *Scudder* v. *Bank*, 91 U. S. 406; *Bigelow* v. *Burnham*, 83 Iowa, 120; *Smith* v. *Parsons*

(Minn.), 57 N. W. 311; *Andrews* v. *Pond,* 13 Pet. 77 ; *Watson* v. *Lane,* 52 N. J. Law, 550; *Stillwell* v. *People,* 57 Pac. 14; Parsons on Notes and Bills, 336 *et seq.;* Edwards on Bills, 717; Daniel on Neg. Inst., Sec. 923; *Vinson* v. *Platt,* 21 Ga. 135; *Bank* v. *Youngs,* 37 Mo. 398; *Dickinson* v. *Edwards,* 77 N. Y. 573. The fact that the loan is made on real estate does not change this rule. *Trust Co.* v. *Burton,* 74 Wis. 329; *Association* v. *Hoffman,* 27 S. E. 692; *L. Co.* v. *Shain,* 77 N. W. 1006.

6. The deed of trust executed by Carr and wife was recorded, and was notice to all subsequent grantees and incumbrancers of its contents. *Baker* v. *Bliss,* 39 N. Y. 70; *Reed* v. *Gannon,* 50 N. Y. 345; *Cambridge* v. *Delano,* 48 N. Y. 326; *Insurance Co.* v. *Halsey,* 8 N. Y. 271; *Acer* v. *Wescott,* 46 N. Y. 384; *McPherson* v. *Rollins,* 107 N. Y. 316. The appellee therefore took title to the premises subject to the contract and its performance.

7. The appellee and his assignors never sustained toward each other the ordinary relation of debtor and creditor. *Eversman* v. *Schmidt,* 41 N. E. 139; *Leahy* v. *National Asso.,* 76 N. W. 625; Endlich on Build. Asso., Secs. 77, 79, 122, 124; and cases cited.

8. Upon the facts in this case, the appellee is the legal or equitable holder of the shares of stock pledged by Carr as collateral security to his loan, and is bound to pay monthly dues on such shares and the interest and premium on said loan until the shares have matured and become worth the sum of $100 per share, or to pay the difference in cash between the amount of said loan, plus all arrearages of interest and fines, and the withdrawal value of said shares, before he is entitled to a release of said deed of trust.

*Mr. Charles Cowles Tucker* for the appellee :

1. If the contract between appellant and Carr is *ultra vires* and void, then the deed of trust, which is part of the contract, is also void, and is no lien against the real estate in

question. But if it be conceded that the plea of *ultra vires* by the appellant, if sustained, will nevertheless leave the deed of trust an existing lien against the real estate, to allow such a plea, in the circumstances of this case, would be wrong and inequitable and contrary to and against all authority. *Arms Co.* v. *Barlow*, 63 N. Y. 62; *Kadish* v. *Equitable Asso.*, 38 N. E. 236; *Darst* v. *Gale*, 38 Ill. 141; *Association* v. *Bank*, 99 Wis. 31; *Bradley* v. *Ballard*, 55 Ill. 413; *Navigation Co.* v. *Weed*, 17 Barb. 378; *Poock* v. *Building Asso.*, 71 Ind. 357. A corporation may not avail itself of the defense of *ultra vires* when the contract had been in good faith fully performed by the other party and it has had the full benefit of the performance and of the contract. 27 Am. & Eng. Encyc. L. 364.

2. The right of a borrowing member to a release of a deed of trust upon payment of his monthly instalments for the definite period fixed by his contract is settled for this jurisdiction by the case of *Armstrong* v. *Loan Asso.*, 15 App. D. C. 1. See, also, *Savings Asso.* v. *Shea*, 55 Pac. Rep. 1022.

3. Where loans by building associations are made payable in a definite period, and not on the maturity of stock issued to the borrower, the borrower is entitled to a release of his mortgage or other security upon the expiration of the period fixed. *Association* v. *Wagner*, 122 Ind. 78; *Cason* v. *Seldner*, 77 Va. 293; *Sparrow* v. *Farmer*, 26 Beav. 511; *Association* v. *Cairns*, 16 Wash. 215.

Mr. Justice SHEPARD delivered the opinion of the Court:

The first contention on behalf of the appellant is, that the contract of John A. Carr, under whom appellee claims title, consists not only of the notes and trust deed, but also of the certificate of stock, and the charter and by-laws of the association as referred to therein; and, consequently, that the latter must be given their full effect in the construction of the trust deed. This may be conceded to be

correct in respect of such of the manifold provisions of the charter and by-laws as are pertinent to the special contract of loan and security, and are not repugnant to, or inconsistent with, the express stipulations of the latter.

The trust deed is the main feature of the contract; subject to it, the appellee acquired his title; and its terms and conditions, where express and plain, necessarily measure the rights of the contending parties.

Whether the construction of the contract, in its entirety, shall be according to the law of New York, as contended by the appellant, under an express provision of the by-laws to that effect, or according to the law of the District of Columbia, where the trust deed was executed and wherein the land affected wholly lies, is a question that does not necessarily arise and will not therefore be determined. There is no question of usury involved in the case as presented. Having examined the decisions of the courts of New York, to which our attention has been called, we have found none construing the law of the State, or the charter and by-laws of association thereunder, in relation to such a contract as is here presented. The nearest approach thereto is found in the case of *O'Malley* v. *Peoples' B. Asso.*, 92 Hun, 572.

That was an action brought by a non-borrowing subscriber to recover the sum of $100 per share on five shares of stock. He had completed his payments for the period stipulated in his certificate, and claimed under the express promise (practically the same as contained in Carr's certificates) to pay the said $100 for each share upon the completion of the period aforesaid. The sum total of his payments upon the five shares, with interest properly calculated, amounted to $371. It was held that the absolute promise of the certificate was controlled by the terms of the charter and by-laws referred to therein, which introduced the condition that the full payment should depend upon the existence of profits sufficient to bring the shares to par upon the attainment of the period.

The decision is confined therefore to the question of the liability of the association, under its charter and by-laws, to pay to a subscriber who, having obtained no loan or advance, had retained the possession and control of his stock and had demanded performance according to the letter of his certificate.

In the case at bar the continuing rights and liabilities of the subscriber, Carr, whether considered as borrower or otherwise, are not involved. The appellee does not claim to have succeeded to any right that Carr may have as an original subscriber, if there be any such remaining since the reassignment of his certificate to the association. He does not pretend to have taken any transfer of stock or right to stock. He simply purchased the land incumbered by Carr's mortgage, and holds it subject to the obligations created by said instrument, and nothing more.

Deprived of the aid of an interpretation by the courts of the creating State, and looking at the provisions of the statute, the articles of the charter, the by-laws and the special conditions contained in and indorsed on the certificate of stock, we find them difficult of apprehension and of reconcilement with each other in all respects. The ultimate end of the corporation is not at all clear. It is called a building and loan association, and it has expressly assumed the functions of a savings bank.

The main purpose seems to be the collection of funds for loans, at high rates of interest, partly disguised under the term of premium. Improvement of property is not required and may, or may not be, the purpose of obtaining the loan.

To whom the ultimate benefit of profits shall accrue, in the event of the anticipated, or more than anticipated, success of the scheme, is involved in uncertainty. The borrowing subscriber at once transfers his stock to the association, and his connection ends with the payments stipulated for on his part.

Upon the completion of the fixed period in the case of the non-borrowing member, he may be paid par value and his interest terminated. Under certain conditions, also, his stock may be canceled before maturity upon repayment of his advances, in the way of dues, with interest. No matter · what the profits of the association shall have been, the subscriber must content himself, according to the letter of the contract, with the receipt of the par value of the stock upon the conclusion of the stipulated period. Under these provisions it would seem that the managing officers might redeem and cancel all stock, and there would be no one left to contest with them the appropriation of surplus profits. Now, then, wherever the by-laws of such an institution are uncertain in their meaning and bearing upon contracts entered into with persons applying for membership, or there is uncertainty or ambiguity in the terms of the special contract for a loan, when considered in connection therewith, we are of the opinion that justice demands the adoption of a construction most favorable to the subscriber.

There appears to be a general division of subscribers to the stock of this association into borrowers and non-borrowers, and provisions of the by-laws are directed to the regulation of these two distinct relations; and this distinction must be observed in considering their bearing upon the additional contract made with the subscriber when he becomes a borrower upon the security of stock only, or upon independent security as in this case.

In this respect there seems to be no substantial difference, as disclosed by the charter and by-laws respectively, between the scheme of this association and that considered in the recent case of *Armstrong* v. *U. S. B. & L. Asso.*, 15 App. D. C. 1.

The contract of the borrower in that case differed from the contract in this, in that the former did not execute negotiable notes payable monthly as herein, but instead entered into a single bond payable in monthly instalments extending through a like fixed period. In connection

therewith, the borrower made the same absolute assignment of his stock to the corporation as was executed by John A. Carr in receiving this loan.  It was said in that case by Mr. Justice Morris: " In the organization there is reference to stock and shares of stock; but it is very evident that as compared to ordinary joint stock companies, these expressions are misleading.  Possibly, as long as the members of these building and loan associations remain lenders and do not become borrowers, there is but little difference between them and the stockholders of joint stock companies in respect of their rights and liabilities, the principal difference perhaps being that, while the stock of these latter is anticipated to be paid up in full immediately upon the organization of the companies, or within a reasonable time thereafter, and such payment in full is always an outstanding liability on the part of the stockholders, in the building and loan associations, on the other hand, payment in full for stock is not a personal liability and is never anticipated until the time fixed for the dissolution of the organization, when the stock is supposed, as the expression is, fully to mature, by the payment of monthly dues, interest, premiums, fines and penalties.  But when the members become borrowers their interest in the association is absolutely at an end, except as to their contract as borrowers. They have no further interest than to pay their monthly instalments as stipulated in that contract.  They have no right to participate in the ultimate profits of the organization, if such there should be; and that there will be such is, of course, always the anticipation; and if there should be losses they are not liable to contribute to defray such losses.  It is true that, in order to qualify themselves to become borrowers, they must become members of the organization by the ownership of a number of shares of stock commensurate with the amount of money which they propose to procure to be advanced to them.  But when they become borrowers their holding of stock becomes merely

nominal; it is simply a measure for the amount of the monthly payments which they are to make thereafter. In fact it is part of the contract which they make as borrowers that they at the same time assign and transfer all their stock to the association; and the stock is then said to be redeemed by the association. That stock never reverts to the borrower. When the contract is fully performed, the benefit of the stock inures exclusively to the association, that is, to the benefit of the so-called investing or non-borrowing members. In fact, to all legal intents and purposes, when the stock becomes pledged at the time of the advancement of the money, the association becomes the absolute owner of it, and the borrower or borrowing member has no further connection whatever with it beyond the liability to make the payments of which it is the stipulated measure. There is, it is true, one contingency in which, by the by-laws of the association, the borrowing member is allowed to reinvest himself with the ownership of this stock; and that is by the practical rescission of the contract, by the repayment of the money advanced to him with interest. But this is at the option of the borrowing member; and there is no reciprocal right in the association to compel such choice on the part of the borrower. The existence, therefore, of such an option does not affect the statement which has been made that the borrowing member virtually ceases to be a member, and ceases to be a stockholder in the ordinary sense of that term, as soon as he has transferred his stock to the association, although that transfer is designated as a pledge." 15 App. D. C. 12, 13; see cases cited therein, and *Fidelity Sav. Asso.* v. *Shea,* 55 Pac. Rep. 1022.

The substantial result of the transactions between Carr and the association, beginning with the subscription to the stock and ending with the trust deed, was the prepayment and surrender of his stock, and the conclusion of a loan on independent security.

Instead of continuing the payment of monthly dues, as first contemplated, for the estimated period, and waiting to receive the promised $100 per share at its end, he applied for and obtained an advance of that sum. · In consideration of the advance of the $3,500 he assigned and surrendered the thirty-five shares and all interest therein and then gave his independent obligation to the association for the increased sum of $4,245.57. This sum was represented by seventy-eight notes payable monthly thereafter, and perfectly secured by the trust deed. He ceased to be an investor under the savings bank feature of the charter, and became a borrower, a debtor of the association.

The corporation obtained the return and redemption of · thirty-five shares supposed to be of great earning capacity, and a profitable investment for its surplus money, the repayment of which, in monthly instalments, began at the end of the first month.

The corporation itself goes so far as to admit in its answer: " That the monthly payments mentioned and referred to in said deed of trust comprise the monthly payments of dues estimated to accrue and become payable on said thirty-five shares until the same should mature or reach their par value, said dues being at the rate of seventy-five cents per share per month, and in addition thereto the aforesaid monthly interest and premium during said period."

That the business of the association, subsequent to the settlement with Carr as aforesaid, might result in less than the anticipated profit, or even in losses, certainly can not affect the pending question between the association and the present owner of the land, whose sole liability is expressed in the conditions of the trust deed.

The provisions of the trust deed conform to and evidence the view we have taken of the relations of the parties. In addition to those quoted in the preliminary statement, the stipulation for the disposition of the proceeds in case of forced sale is important. The trustees are empowered

" from the proceeds of said sale, first, to pay all proper
costs, charges and expenses and retain as compensation a
commission of 2½ per cent. on the amount of said sale, and
then to pay whatever may then remain unpaid on said
loan, including interest, premium and fines whether the
same shall be due by the terms of said notes or not, and
lastly to pay the remainder, if any, to the said John A.
Carr, his heirs and assigns."

There is no provision covering the payment of any
monthly dues on stock. These were, as has been admitted
in the answer, provided for in the notes until the expiration
of the 78 months at least; and under the association's own
view of the liability of the subscriber, the possibility of the
necessity for the demand of dues thereafter was not reason-
ably expected and would necessarily remain a mere matter
of conjecture.

In case of sale upon default in payment of a note or
notes, the trustees could only deduct expenses, commissions
"and interest, premium and fines;" the remainder was
required to be paid to the mortgagor or his assigns.

And the same situation occurs in case he should avail
himself of the privilege to pay the notes before maturity.
They were not only payable "on or before" the dates of cer-
tain maturity, but section 6 of the by-laws, indorsed on the
certificate, also permits the borrower, as we have seen, to
pay off the incumbrance and requires the association to
make him an equitable discount in such event.

The "fines" above mentioned are clearly those described
in section 5 of the aforesaid by-laws which prescribed a fine
of 25 cents per month per share for failure to pay interest
on loans. This was an additional penalty to the interest
borne by unpaid notes after maturity.

There could be no fines for non-payment of stock dues
under the original subscription, because these had been
anticipated and embraced in the notes.

The claim, then, that the trust deed also secured the

payment of possibly accruing dues after the discharge of the last note secured by it, and would remain in force indefinitely, or that in case of sale the surplus proceeds would have to be retained for the same purpose, is utterly opposed to the plain meaning of its express terms and conditions. Mere reference to the charter and by-laws can not give the instrument this additional scope. *Bowen* v. *Lincoln B. & L. Asso.*, 51 N. J. Eq. 272, 280; *Fagan* v. *People's B. & L. Asso.*, 55 Minn. 437, 441.

The general covenant of Carr, contained in the before recited provisions of the trust deed, "to keep and perform all promises and engagements made and entered into with the said association according to the true intent and meaning of its by-laws and articles of association," can not be interpreted as changing the obvious intent and purpose of that instrument.

Moreover, the idea of exacting security for the payment of monthly dues, when unanticipated, and fines for their non-payment, is opposed to the plain provisions of the charter and by-laws. The obligation is personal, and the remedy in case of his continued default is the forfeiture of all payments previously made and of all rights as a member.

Again, section 11 of the by-laws expressly permits the prepayment of shares, or a partial advance payment of dues under guaranty of a discount of 5 per cent. per annum.

The view that we have adopted of the true relations between Carr and the association, has been clearly apprehended by the latter, and is attempted to be met by the following paragraph of its answer:

" That under and by virtue of said laws and its articles of incorporation, by-laws, rules, and regulations this defendant is a purely mutual corporation, in which the rights and duties of all of its stockholders are mutual and reciprocal, and that no stockholder who has borrowed or obtained an advance of the full maturity value of the shares held by him and pledged upon such advance is entitled to have his deed

of trust or other obligation given as security for the repayment of said advance released, canceled, or surrendered until the dues upon said shares so advanced upon and pledged on said loan, together with the earnings to which the same are entitled, have made said shares worth their par or maturity value, to wit, $100 per share, and that any pretended or alleged contract or agreement for the repayment of the principal moneys so loaned or advanced and the releasing of the deed of trust or other obligation at a fixed period of time regardless of the actual value of the shares held by such borrower and obligee on said advance is beyond the corporate powers of this defendant, destructive of the right of mutuality between its stockholders, *ultra vires* of the corporation, and void; but that there is any such agreement on the advance made to John A. Carr and secured by the deed of trust referred to in the bill of complaint herein is denied."

It is not apparent that the contract, as construed, is beyond the powers of the corporation, especially since the Court of Appeals of New York has held that the statute under which the incorporation was had does not forbid the issue of prepaid stock. *People* v. *Preston*, 140 N. Y. 549.

But if conceded to be *ultra vires*, it is not perceived how the appellant could take any benefit therefrom.

The trust deed is a part of the contract and if that is void or voidable, must fall with it.

The vendee of the land covered by it, instead of questioning the validity of the loan contract or the trust deed to secure it, concedes its lien and volunteers the payment of the last of the unpaid notes. The association must take the money and release the incumbrance.

The decree appealed from is correct and is affirmed, with costs.                                             *Affirmed.*